**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 05-870-PHX-DGC |
| Plaintiff, | **ORDER** |
| vs. | |
| Jeffrey A. Kilbride (2), James R. Schaffer (3), | |
| Defendants. | |

The Court held a sentencing hearing on September 24, 2007. Defendant Kilbride was sentenced to 78 months in prison, Defendant Schaffer to 63 months. The Court's conclusions and rulings were stated on the record. This order will further explain some of the rulings.

1. The Court applied the current Guidelines Manual. The Court previously had concluded that the manual effective on November 1, 2004, was applicable to the offenses in this case. Dkt. #353. Because use of the current manual did not present *ex post facto* problems when compared to the 2004 manual, the Court applied the manual in effect on the date of sentencing as required by the Guidelines. *See* § 1B1.11.

2. The Court determined that America On-Line ("AOL") had suffered a loss of $77,500 as a result of Defendants' conduct. The Court therefore applied an eight-level enhancement under § 2B1.1(b)(1)(E). This loss determination was based on credible evidence from AOL that investigator Eric Zeller devoted 620 hours to investigating Defendants' spam emails. Evidence presented at the sentencing hearing also demonstrated that Mr. Zeller's combined compensation and benefits cost AOL $125 per hour. Although

Defendants argued that AOL would have incurred this cost regardless of whether Defendants sent their emails, AOL could have used the 620 hours of Mr. Zeller's time on other valuable projects had it not been required to investigate the hundreds of thousands of complaints resulting from Defendants' spam pornographic emails. Defendants deprived AOL of 620 hours of Mr. Zeller's time, resulting in a total loss of $77,500.

Mr. Zeller testified that he met with two law firms during the course of his investigation, Internet Law Group and Latham & Watkins. The Government asserted that AOL's loss should include the fees paid to these firms. AOL was unable, however, to make any approximation of the fees paid to Internet Law Group in connection with Mr. Zeller's investigation. And although AOL Vice President Brian Sullivan estimated that AOL paid approximately $52,000 to Latham & Watkins in connection with the investigation, he readily admitted that his estimate was somewhat speculative. Mr. Sullivan testified that AOL paid more than $1 million to Latham & Watkins between December 2003 and March 2004. He estimated that five to ten percent of this work was spent on Mr. Zeller's investigation, but he provided no documentation or other factual support for this estimate.

It is apparent that Latham & Watkins had a very large retainer with AOL. The firm was paid more than $250,000 per month for its work for the company. Mr. Zeller testified that he met with outside attorneys during a monthly trip he made to Virginia, suggesting that monthly meetings with outside lawyers were regular occurrences for AOL investigators. Because the Government presented no evidence concerning the specific work Latham & Watkins did in connection with Mr. Zeller's investigation of Defendants' emails, the Court was not able to determine whether AOL would have incurred the resulting legal fees in any event. For example, if Latham & Watkins performed legal research in connection with Mr. Zeller's investigation, it is possible that the law firm would have been required to conduct the same research in connection with other ongoing AOL investigations. If the firm provided counsel to AOL on whether a criminal case could be made from Mr. Zeller's investigation, it is not clear that such analysis, which ultimately is the province of the Government, should be viewed as a necessary loss caused by Defendants. In short, the Court could not determine

1  with confidence that Mr. Sullivan's estimate accurately reflected legal costs that were caused
2  solely by Defendants and would not otherwise have been incurred by AOL.

3        The Government asserted that AOL incurred other losses such as damage to its
4  reputation, loss of customers, and possible loss of overall corporate value. The Government
5  conceded, however, that it was unable to estimate the value of any such loss. Nor could the
6  Government present evidence regarding losses to other Internet Service Providers as a result
7  of Defendants' conduct.

8        The Court previously concluded that Defendants' gain does not represent a reasonable
9  alternative measure of loss. Dkt. #353 at 6-8. The Court therefore applied the loss amount
10 that was reasonably established by the Government's evidence, $77,500.

11       3.    The Court did not apply the two-level enhancement for obtaining email
12 addresses by improper means. This enhancement requires that Defendants be convicted of
13 offenses under 18 U.S.C. § 1037, and also that "the offense involved obtaining electronic
14 mail addresses through improper means." § 2B1.1(b)(7). The Government presented
15 evidence that Defendants knowingly purchased stolen email addresses during the years 2002
16 and 2003 – before the effective date of the CAN-SPAM Act and before the 2004 actions for
17 which they were convicted on Counts One through Three. The Government presented no
18 evidence that Defendants obtained email addresses by improper means during their
19 commission of the CAN-SPAM violations in 2004.

20       The Government argued at sentencing that the previous acquisition of email addresses
21 by Defendants should satisfy the enhancement, but it presented no evidence that the
22 improperly obtained email addresses were actually used by Defendants during 2004. More
23 importantly, the enhancement does not require that the offense involve the *use* of improperly
24 obtained emails; it requires that the offense involve the "*obtaining*" of email addresses by
25 improper means. § 2B1.1(b)(7). This distinction has meaning. If one of the Defendants had
26 acquired stolen email addresses several years ago as part of a completely separate endeavor,
27 and happened to use some of those addresses as part of the 2004 CAN-SPAM offenses, the
28 Government would be hard pressed to argue that the CAN-SPAM offense involved the

obtaining of the email addresses. Although the time span is shorter in this case and both Defendants allegedly were involved in purchasing stolen addresses, the distinction between using and obtaining still stands. The Government presented no evidence that Defendants' 2004 offenses included the improper obtaining of email addresses, and the Court therefore concluded that this enhancement should not be applied.

The Government argued that Defendants' 2002-2003 purchase of email addresses may be included as "relevant conduct" for which Defendants are responsible under § 1B1.3. That guideline section renders a criminal defendant responsible for actions he undertakes or causes, or actions by others as part of the jointly undertaken criminal activity, "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of [hiding that offense]." § 1B1.3(a)(1). As already noted, Defendants did not purchase stolen email addresses during the commission of the 2004 offenses, and the Government makes no argument that the emails were improperly obtained in hiding the 2004 offenses. Although it could be argued that Defendants' 2002-2003 purchases were made in preparation for the 2004 offenses, the Government presented no evidence of this specific fact. Defendants were engaged in sending spam emails in 2003, before enactment of the CAN-SPAM Act, and likely used the stolen email addresses in that enterprise. The Government presented evidence during trial which showed that Defendants took several steps in preparation for their 2004 offenses – setting up Ganymede, moving their servers to Amsterdam, moving money overseas, etc. – but presented no evidence that Defendants purchased stolen email addresses as part of that preparation. It is just as likely that Defendants purchased the addresses as part of their 2003 email enterprise. The Court therefore cannot conclude that the 2002-2003 purchases should be considered part of the relevant conduct in this case.

4. The Court applied the obstruction of justice enhancement found in § 3C1.1 to Mr. Kilbride based on his attempted interference with the testimony of Laval Law. The basis for this ruling is set forth in a previous order. *See* Dkt. #353 at 3-5.

Mr. Kilbride's counsel argued during the sentencing hearing that an obstruction of

1 justice enhancement cannot be based on a properly instituted legal action in another 2 jurisdiction. The Court concludes, however, that Defendant Kilbride's lawsuit in Mauritius 3 was not filed for a proper purpose, but instead was a tactical maneuver taken for the sole 4 purpose of interfering with Laval Law's testimony in this trial.

5 The Government first obtained Ganymede documents from Deutsche Bank in 2005. 6 These documents were provided to Defendant Kilbride during the course of discovery in this 7 case. Defendant Kilbride took no action in the Mauritius courts at that time. During early 8 May of 2007, the Government made arrangements for Laval Law to travel to the United 9 States and testify against Defendants at trial. This information was disclosed to Defendant 10 Kilbride before trial, and yet he again took no action in the Mauritius courts. It was not until 11 June 8, 2007, after the start of trial and only days before Laval Law was scheduled to testify, 12 that Defendant Kilbride initiated a legal action in Mauritius concerning the anticipated 13 testimony of Mr. Law and the 2005 disclosure of documents by Deutsche Bank. The 14 resulting order from a court in Mauritius – obtained without the input of Mr. Law, who 15 already had traveled to the United States – barred Mr. Law from testifying about Ganymede 16 in this Court. When Defendant Kilbride's United States counsel learned of the Mauritius 17 lawsuit, he promptly took steps to have Defendant Kilbride eliminate the injunction against 18 Mr. Law. These events confirm the Court's conclusion that Defendant Kilbride initiated the 19 lawsuit in Mauritius not to protect confidential information of Ganymede – information 20 disclosed as early as 2005 – but to interfere with Laval Law's testimony.

21 The Court previously addressed Mr. Kilbride's lack of standing to assert privileges 22 or other interests of Ganymede:

> Defendant Kilbride complains about breach of an attorney-client privilege held by Ganymede Marketing, but has made no showing that he is the holder of that privilege. Ganymede is a corporation, and Defendant does not assert that he is an officer, director, or owner of the corporation. Evidence and argument produced elsewhere in this case (Dkt. #134) suggest that Defendant has an interest in a trust, which has an interest in another trust, which owns the stock of Ganymede. Defendant has produced no authority to suggest that such a remote relationship makes him the holder of Ganymede's privilege, and thus has not shown that he has standing to object to any alleged breach of Ganymede's privilege.

Dkt. #256.

When Defendant Kilbride sought to block the testimony of Mr. Law, he filed the action in Mauritius in his own name. He stepped out from behind the corporate form and the layers of trusts and argued that he had a personal interest in Ganymede sufficient to bar Laval Law from testifying about the corporation. This position was directly contrary to Kilbride's consistent claim of non-involvement with the company and a blatant attempt to prevent Mr. Law's damaging testimony in this Court.

Defense counsel noted during the sentencing hearing that the Court permitted the Government to introduce at trial an affidavit filed by Defendant Kilbride in the Mauritius action. The affidavit was admitted as evidence that Kilbride was a beneficial owner and controller of Ganymede. Defense counsel seemed to suggest that the use of this affidavit is inconsistent with any current conclusion that Kilbride lacked standing to bring the Mauritius action on behalf of Ganymede, but the affidavit was introduced over Defendant Kilbride's objection. The Government was required to prove that Defendant Kilbride owned and controlled Ganymede. Defendant Kilbride cannot have it both ways – he cannot hide his interest in Ganymede through trusts and a foreign corporation and force the Government to prove, at great expense, that he really did own and control the company, and at the same time argue at sentencing that the Mauritius action was perfectly legitimate because he was the true owner of Ganymede. Such duplicity on the part of Defendant Kilbride convinces the Court that the Mauritius lawsuit was not filed for the legitimate purpose of protecting Ganymede, but for the illegitimate purpose of interfering with the evidence in this Court.

Courts have recognized that actions filed in other courts for the purpose of impeding a criminal prosecution are not properly filed and may be enjoined. *See United States v. Lewis*, 411 F.3d 838, 842-46 (7th Cir. 2005) (holding no abuse of discretion in issuance of protective order pursuant to 18 U.S.C. § 1514 enjoining bank robbery suspect from proceeding against bank robbery witness in the 42 U.S.C. § 1983 lawsuit he had filed against the witness); *United States v. Tyson*, 780 F.2d 1569 (11th Cir. 1986) (finding that the district court had authority pursuant to 18 U.S.C. § 1514 and acted within its discretion "to enjoin

defendants and their counsel from bringing a state civil action for slander against a prospective government witness involved in a federal criminal trial 'because' the threatened lawsuit amounted to 'harassment' and had no legitimate purpose."). The Court concludes that Defendant Kilbride's lawsuit in Mauritius was a clear attempt to obstruct justice.

5. For reasons stated on the record, the Court concluded that the Government had not established that proceeds from the obscene images exceeded $10,000 for purposes of § 2B1.1(b)(1). Although the Government's expert testified as to the gross amounts Defendants were paid for advertising pornographic websites that included one of the obscene images, he was not able to isolate the amount paid for the advertising of that image. The Court therefore applied the minimum five-level enhancement under § 2G3.1(b)(1)(A).

6. The Court also concluded that the four-level enhancement for sadistic and masochistic material should not be applied to the images in this case. *See* § 2G3.1(b)(4). The images plainly were obscene, and one of them could be viewed as depicting the infliction of pain. But the images were not clearly sadistic or masochistic, and the Court therefore concluded that the substantial four-level increase in § 2G3.1(b)(1)(A) should not be applied.

7. Given these rulings, the Court concluded that the appropriate offense level for Defendant Kilbride was 28 and the appropriate offense level for Defendant Schaffer was 26. The Court sentenced the Defendants at the low end of their respective guideline ranges. For reasons stated on the record, the Court concluded that these sentences were reasonable and appropriate under the factors set forth in 18 U.S.C. § 3553(a).

8. The Court deferred the determination of a forfeiture amount or fines. On or before **October 1, 2007**, Defendants shall file a memorandum responding to the Government's recently proposed preliminary order of forfeiture. The Government shall file a reply on or before **October 5, 2007**. The Court will rule on the forfeiture and fine amounts without further hearing. The Court's judgments will be entered when it rules on these issues.

In their memoranda, the parties should address the Government's assertion that the Court should enter a money judgment in the amount of $1,137,539.21, in addition to ordering

the forfeiture of specific assets. In connection with this issue, the Court concludes that money received by Ganymede is fairly attributable to Defendants. As indicated in the Court's previous orders (*e.g.,* Dkt. #334), the Court views Ganymede as an alter ego of Defendants. Thus, to the extent Ganymede received proceeds from the CAN-SPAM Act violations or as part of money laundering, the Court concludes that Defendants received those proceeds. The Court is interested, however, in the parties' observations on the proper mechanism for implementing the forfeiture – whether a money judgment in the full amount of illegal proceeds received by Ganymede is appropriate, or whether the Court's order must focus solely on proceeds of the illegal conduct or property traceable to those proceeds. *See* 18 U.S.C. §§ 982(a)(1), 1037(c)(1).

DATED this 26th day of September, 2007.

*Daniel G. Campbell*
―――――――――――――――――――――
David G. Campbell
United States District Judge